People of the State of Illinois, Plaintiff-Appellee, v. Milton Prinsen, Defendant-Appellant.

Gen. No. 52,580.

First District, Fourth Division.

August 6, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Ronald P. Katz and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Morton R. Friedman, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE DRUCKER delivered the opinion of the court.

Defendant was convicted, after a bench trial, of the crimes of robbery and aggravated battery. Judgment was entered and he was sentenced to a term of not less than two nor more than seven years in the Illinois State Penitentiary. Defendant raises two points on appeal: (1) he was not proven guilty beyond a reasonable doubt; and (2) the in-court identification of defendant was tainted by an improper one-man showup.

EVIDENCE

Testimony of Donato Casella, complaining witness:

He is eighty years old but never went to school. He owns a tavern at 2000 West Erie Street. On October 15, 1966, in the afternoon two men came into his tavern; one of them closed the side door. He identified defendant as one of the men who entered the tavern. He made the identification by leaving the witness stand to "see him close, no far." He had seen defendant in the tavern five or six times before the occurrence. Defendant would come from work and buy quarts of beer to take home.

One of the men asked him to turn on the jukebox. When he did so, one of the men grabbed him and did something to his neck. The other one got him in a headlock and pushed him to the floor and put his foot in his

face. The other man hit him in the neck. The defendant went to the cash register. He took about $200 in cash and they took his wristwatch, which was worth about $100.

There are a lot of strong lights in the tavern; it is bright in the tavern because he has a telephone there and the people have to see. The lights were on when the two men came in. The two men stayed about an hour in the tavern. He was unable to describe the clothing of his assailants. It seems that one of them had on a red sweater. The men also took his coat. The men took his pants off. The defendant put a cord around his neck.

James Emerson is not one of the men who robbed him. He did not see Emerson on the day of the robbery. He was tied up without his pants and he managed to move like a sheep with his hands bound in front of him. He moved out the side entrance in an effort to get to his son's establishment next door. He got outside and then toppled over with blood on his nose and mouth. James Emerson did help him get to his son's restaurant.

He does not have eyeglasses; he does not need eyeglasses. He has worked thirty-nine years without eyeglasses. He has not seen a doctor about his eyes. Holding a twenty dollar bill some fifteen to eighteen inches from his face the witness said that it had a number ten or a twenty on it; he finally identified it as a twenty dollar bill. During the inspection of the bill he moved it closer and further away from his face, turned it upside down and turned it forward.

He saw defendant about a week before the robbery when the defendant entered the tavern and stole his gun. Defendant brought back another gun, but he wanted his own gun.

After the robbery the police brought a man to the tavern. That man was one of the robbers; it was the defendant.

Testimony of Harold Marsicek, called by the State:

He is a police officer with the City of Chicago and was so employed on October 16, 1966. On that day he was assigned to investigate a robbery at the 2000 Club. In the course of that investigation he saw the victim, Mr. Donato Casella. Mr. Casella's eyes were discolored; he had contusions about the head and face, and he was discolored down to the middle of his chest and both arms.

Subsequent to the interview with Casella, he arrested the defendant on October 27, 1966. He saw defendant several days before the arrest was effected. On about October 18 he took defendant to the 2000 Club (Casella's tavern). At that time he had a conversation with Casella. Defendant then said to Casella, "Danny, I'll straighten it out for the gun." At that time Casella identified defendant as one of his robbers. Defendant admitted taking Casella's gun about a week or two prior to the robbery.

Defendant was not placed in custody on October 18 because his accomplice was still at large and the police were continuing their investigation to find the other man.

Testimony of William J. Kelley, called by the Defense:

He is a police officer for the City of Chicago. He has been assigned to the 13th District, which includes the 2000 Club, for six years. He does general patrol duties which include checking taverns. He was in the 2000 Club in the early part of September. He had several occasions to observe the complaining witness pick up money; the complaining witness would have to move the money back and forth to focus on it.

Testimony of James Victor Emerson, called by the Defense:

He faintly knew the defendant although he lived next door. He had seen him walk through the alley "quite a bit." He has been a patron of Danny Casella's tavern and visited there two or three times a week. He left work on

October 15, 1966, at 3:30 in the afternoon, walked home, arrived there at 3:45 and left for the tavern. As he approached it he noticed two men walking out of the front door. One of the men was between eighteen and twenty years old, with copper hair darker than the defendant's, about five feet ten inches in height and weighing about 145 pounds. He was wearing dark trousers and a tan sweater. The other man was about five feet nine inches, weighed about 150 to 155 pounds, had black hair and was also about eighteen or twenty years old. He was wearing a black leather jacket and black trousers, and was carrying a jacket over his left arm. If those two men were in the courtroom he would be able to identify them. Defendant is not one of the two men whom he saw leaving the tavern that afternoon.

When he entered the tavern he immediately saw the complaining witness crawling on his hands and knees near the cooler and side entrance; there was a wire wrapped around his neck. The lighting in the Club was very dim; the overhead lights were not on; only the cooler lights, the Drewry signs and the lights on some pictures were on. He helped the complaining witness put his trousers on and then assisted him over to his son's restaurant. There were quite a few patrons in the restaurant at the time. He told the son what had happened.

On October 15, 1966, he did not have anything to drink from the time he left work.

Testimony of Carey Rutz, called by the Defense:

He lives at 2638 South Pulaski on the third floor; it is a six-room apartment. His father, the defendant, and defendant's wife reside in the apartment. October 15, 1966, was a Saturday, and he awoke at about 9:00 a. m. Shortly after that defendant awoke. Defendant remained in the house until 1:30 p. m. when he left the house in the company of Walter Rutz (witness' father). Defendant returned at about 3:30 p. m. still in the company of

Walter Rutz. At that time the three of them began to play cards on the kitchen table. He then left the apartment with the defendant to do some shopping at the grocery store across the street. Defendant was in his company throughout the shopping expedition.

After the shopping was completed he and the defendant returned to the apartment and played some more cards; they played for about a half hour and then defendant went to lie down in his bedroom. The witness remained at the kitchen table after defendant retired; the kitchen is about six feet from defendant's bedroom which is just off the kitchen. At that time there were three people in the apartment; they were the witness, the defendant and the witness' father.

After the defendant retired to his bedroom, witness' father went to his bedroom to lie down also. The father's bedroom is the middle bedroom.

There are two entrances to the apartment; one is the back door in the kitchen and the other is just before you get to the front room. Defendant's bedroom is closer to the kitchen than the father's bedroom. Defendant left his bedroom door open. The next time he saw defendant was at 7:00 p. m. when defendant woke up; defendant was going out to pick up his check. Had defendant left his bedroom and used the back door, he would have seen defendant.

Testimony of Walter J. Rutz, called by the Defense:

He is the father of the previous witness. On October 15, 1966, he was living at 2638 South Pulaski in an apartment with his son, the defendant and the defendant's wife. On that day he arose at 7:00 a. m. His son woke at 9:00 a. m. shortly before the defendant got up. They all remained in the apartment until he and the defendant went out at 1:00 or 1:30 p. m. to watch a football game on the TV in a nearby tavern.

He remained in the tavern with the defendant until 3:30 p. m. at which time they returned to the apartment.

368

Defendant was in his company at all times except for a few minutes when defendant went to the bathroom. It is pretty far from 2638 South Pulaski to 2000 West Erie.

After returning to the apartment at 3:30 p. m. they played cards for awhile. At about 4:30 p. m. defendant went with Carey Rutz to the grocery store. They returned to the house fifteen or twenty minutes later and resumed playing cards for awhile. Defendant then laid down on his bed; and shortly thereafter the witness went to his bed and laid down himself. He had to pass through defendant's bedroom to get to his bedroom. Defendant's bedroom door was left open and he was able to see that defendant was in his room.

There are two entrances to the apartment; one in the kitchen and one off the dining room. If defendant had left the apartment by the front door, he would have seen defendant; if defendant had left the bedroom for any reason, he would have seen defendant.

Defendant got up at about 7:00 p. m. and ate a few potatoes.

Testimony of Milton Ronald Prinsen, the defendant:

On October 15, 1966, he was living at 2638 South Pulaski with Wally Rutz and his son Carey Rutz. He had been living there for about three weeks and his wife did not live with him; prior to that he had lived in the neighborhood of 2000 West Erie.

On the day in question he was nowhere near 2000 West Erie. He woke up about 9:00 or 9:15 a. m. and found that Wally and Carey Rutz were already awake. He remained in the apartment until 1:00 p. m. when he went to a tavern at 2640 South Pulaski with Wally. They remained in the tavern until about 3:30 p. m., at which time they returned to the apartment. He remained in the apartment for about half an hour playing cards and then he accompanied Carey Rutz to the grocery store. They remained in the store for about twenty minutes and

then returned to the apartment where they played cards for another thirty minutes.

After they finished playing cards he went to bed in the first bedroom off of the kitchen. He left the door open. He got up again at about 7:00 p. m. and ate some potatoes that Wally Rutz had fried.

He lived in the neighborhood of the 2000 Club for six to nine months and he knew Mr. Casella from his visits to the tavern. He also knew James Emerson but they were not social friends. He drank with Emerson a couple of times. Some three weeks prior to the robbery he had an altercation with Mr. Casella. He purchased a six pack of beer and laid $1.30 on the bar. Casella told him that it was not enough money and pulled a gun out. Casella then laid the gun down and defendant took it and walked out of the tavern. He eventually gave the gun to a neighbor.

Testimony of Michael A. Casella, called by the State in rebuttal:

He is the son of the complaining witness. At about 5:00 p. m. on October 15, 1966, he saw his father outside of his restaurant. His father was on his two feet with a cord around his neck and with his shoes and pants off. There was nobody helping him. He saw Emerson a few minutes after he brought his father into his restaurant. When he went out the front door he saw Emerson standing by the side of the tavern door about 75 feet away; Emerson did not come into the restaurant. He had a conversation with Emerson. Emerson said to him, "I saw a couple of kids, I saw them going down Damen Avenue."

He has observed many people drinking. Based upon his experience operating a tavern, he believes that Emerson was inebriated. When he encountered Emerson, Emerson's eyes were bulging out of his head, his voice was mumbling and fumbling and he was not walking straight.

His attention at the time he first saw his father was focused only on his father.

Testimony of William O'Connor, called by the State in rebuttal:

He is a police officer of the City of Chicago and he was assigned to investigate the Casella robbery. On October 18, 1966, he spoke to Walter Rutz at the Pulaski Road apartment. The defendant was present. Defendant told him that it was defendant's apartment, that he lived there with his wife and that he was with Walter Rutz on the day of the robbery.

Walter Rutz told him that on the day of the robbery defendant and he left the apartment at about 7:30 in the morning to go down to a tavern where they drank beer until about 1:30 p. m. Rutz said that they went back upstairs and that he (Rutz) went to bed and that defendant left the apartment. Rutz said that the next time he saw the defendant was at 7:30 p. m. Rutz never mentioned that his son was in the apartment.

Testimony of Harold Marsicek, called by the State in rebuttal:

He is the same Harold Marsicek who testified earlier. Walter Rutz told him that on October 15, 1966, his estranged wife was there for the weekend; he never mentioned his son. He was asked who was present and replied that he, his estranged wife and defendant were there.

OPINION

Defendant first argues that he was not proven guilty beyond a reasonable doubt. He contends that reversal on these grounds is required because the identification by the State's only eyewitness was vague, doubtful and uncertain, that the only other person who saw the robbers, James Emerson, stated positively that defendant was not one of them, and that he has presented a corroborated account of his activities for the entire day of the robbery. The State responds that the testimony of Emerson is questionable because he may have been inebriated at the

time and because his testimony conflicts with that of Michael Casella, the son of the complaining witness. The State also contends that it has effectively rebutted the alibi evidence with testimony of police officers who interviewed one of the alibi witnesses and were given a statement at that time that conflicts with the story told at trial. The State was further able to show that the complaining witness knew the defendant; but the testimony of a police officer called by the defense and the results of an in-court eye test establish that the complaining witness had bad eyesight. The State also developed the fact of some considerable animosity between complaining witness and defendant.

Reviewing the entire record we cannot say that defendant was proven guilty beyond a reasonable doubt. The complaining witness' identification of defendant is not convincing. It is clear from the record that the complaining witness had bad eyesight; and although he well could have identified an individual that he knew, his identification of defendant is directly contradicted by James Emerson. While the complaining witness was only able to say that defendant was one of the assailants, he was unable to give a description of the other man nor was he able to describe the clothing worn by either. Emerson, on the other hand, gave physical descriptions of both men he saw fleeing the tavern and described their clothing. He even testified that one of the men was carrying a coat over his arm which could have been the coat stolen from the complaining witness. There was some testimony that Emerson was inebriated at the time; but that testimony was given by the son of the complaining witness who admittedly was not paying very much attention to anyone but his father. Further there was no testimony from the police officers who interviewed Emerson immediately after the robbery that he was drunk. Emerson is corroborated in an important part of his testimony by the complaining witness who testified

that Emerson "help me to my son, take me into the restaurant." This evidence raises grave doubts as to the validity of the complaining witness' identification.

Further, defendant presented an alibi which was corroborated by the consistent testimony of two witnesses. The State presented evidence that one of the alibi witnesses told a different and conflicting story to police officers when he was interviewed three days after the robbery. However, there is no rebuttal of the testimony of Carey Rutz' testimony; and this is persuasive because it was Carey Rutz who claimed to have been with the defendant at the time that the robbery was being committed. Finally, we note that the police failed to arrest defendant after a face-to-face identification by the complaining witness. The refusal to arrest indicates that either the police doubted the sufficiency of the identification or that there actually was corroboration of defendant's alibi. We cannot accept the explanation of the release of defendant as a means to the capture of his alleged accomplice.

Given the unconvincing nature of the identification when set off against the alibi evidence, the judgment of the trial court must be reversed. Since we hold that defendant was not proven guilty beyond a reasonable doubt, it is not necessary for us to consider the contention that defendant was subjected to an improper one-man showup.

Reversed.

ENGLISH and McNAMARA, JJ., concur.